The next case for oral argument this morning is 25-1395, United States v. Lindstrom, of the appeal of David Ventus. Mr. Stewart, whenever you're ready. May it please the court. The district court erroneously rejected David Ventus' motion to impose transfer liability on Ryan Building Proof. Ventus had a judgment against Thomas Lindstrom, and by a citation to discover assets, had attached stock options belonging to Lindstrom and held by Lindstrom's employer, RBG, that were later valued at about $445,000. When RBG terminated Lindstrom, the value of the stock options were recast into a lump sum severance payment, but before RBG paid that lump sum, they deducted about $372,000 in debts that Lindstrom owed RBG, leaving a net severance of about $73,000. The problem with that result is that by virtue of his citation, David Ventus had a lien on those stock options, and he had a first lien on those stock options. Did the citation give him the lien given that the options were not specifically listed? You had noted that you reserved the right with respect to them. Is that sufficient to give a lien? Well, Your Honor, the sworn answer of RBG when we initially served them with the citation to discover assets, they filed a sworn answer, and that sworn answer did identify the stock options. They didn't identify the value of the stock options. We pressed them on that, but they did identify the stock options themselves, and that's under oath. That's a matter of undisputed fact. So once again, the problem with what RBG did in this case is that they basically ignored David Ventus's lien on the stock options. Now, in opposition to the motion for imposing liability under the citation statute, RBG defended alleging that the options had expired and that the December 2023 agreement, which was the recasting of the stock options into a severance payment, a lump sum severance payment, was merely just a hypothetical exercise. Did we have any evidence that the options had any value as of December? Yeah, go ahead. Well, there was no dispute that RBG had valued the stock options at $445,000, none whatsoever. And the whole question was whether that value had expired. And it was our contention that the expiration issue was something that was brought up far after the fact. It was really just a red herring for RBG to get around David Ventus's lien so they could satisfy their own debts, their own $372,000 in debts, rather than pay over the $445,000. Was the expiration disclosed in response to the citation? I'm sorry? Was the expiration, the 30-day expiration, disclosed in response to the citation? Not specifically, Your Honor. The agreement was provided to us. But all along, you know, this issue of the expiration never came up. It was in the agreement, though, right? It's in the agreement. But, you know, once again, that agreement was really honored in the breach as between Lindstrom and his employer. You'll find that at page 44 of our brief. They extended those expiration dates any number of times. And the whole relationship between Lindstrom and his ex-employer was really sort of close, and they never really honored that contract in any sort of formal way. The notion that the 30 days were there, can you just comb through or walk us through procedurally? I know we've been presented with some of the information attached to the motion to show cause. We were able to see some of the communications between counsel and RBG. At what point was Mr. Venkus put on notice that Lindstrom was being terminated? In essence, that the stock options are now at play. We were never notified until October 31st, and that was about three weeks after RBG had terminated Lindstrom, and only because we had been pressing RBG about the lack of payment because they were paying over his non-exempt wages to us. The district court, in this case, what was pivotal here is that the district court decided two issues. On the statutory interpretation issue, the district court decided that a severance payment under the Illinois Wage Deduction Act was exempt. This was contrary to the Arrow v. Harrell decision, which we cited in our motion, and we cited throughout this case. But Arrow interpreted a different version of the statute, which applied gross wages, which had a very different definition than what we're dealing with in 801 and 803. Your Honor, in our brief, we addressed this. Substantively, the definition of wages are really no different in the older version of the statute than the newer version of the statute. It's a change in wording, but not in how gross wages are calculated or how net wages are calculated. The total compensation received for services rendered in a particular pay period, that is different than how wages are defined in 801. In other words, I don't think you could put as much stock in Arrow as you do. Okay. Well, that being said, Your Honor, we would still fall back on our interpretation of the statute itself. Neither 801 nor 803, it all mentions the word severance in the definition of what wages are. All the terms that they use to identify wages that are subject to the Winnower Wage Deduction Act are things that have both a service and a periodicity component to them, something that a lump sum, gratuitous severance payment at the end of the termination of somebody's employment, they don't have those attributes. And certainly in this case, they didn't have those attributes. The statute itself is quite clear, and there was no reason for the court to look beyond the statute itself. It doesn't say severance payment. And there's no case that has decided that a severance payment is wages protectable under the Illinois Wage Deduction Act. What about other compensations? That seems pretty broad. Right. Well, this court has said that when you have specific terms, in this case hourly salary bonus commissions and so on, and then that general term at the very end, the general term takes on the characteristics of those specific terms that lead into it. The general term isn't there just to open the door. If it were, Judge, any sort of compensation paid from the employer to the employee or the ex-employee now could be deemed exempt. The employee could damage his car in the parking lot, and the employer could pay him that money, which would be an ordinary debt in any other circumstance subject to a creditor's lien. And they would escape liability because basically the district court's determination that a property is exempt basically strips the lien from the property itself, and that's what we're contending in this case. Fundamental error. Mr. Stewart?  In 12-801, or the definition of wages that we're talking about, includes the critical limitation owed by an employer to a judgment debtor. I understood RBG's position to be here that they did not owe Mr. Lindstrom any of this amount of money, that this was a kind of act of charity to be fair and decent to the man who had embezzled several hundred thousand dollars from them.  If it were deemed a charity, what legal effect would that have on your claim? Well, you know, Judge, thanks for that question. You know, it's something that I considered more preparing for this oral argument, and it's nothing that we argued in the briefs or even below, but you're right, I think, in the implication of your question that, you know, this money wasn't owed. It was a gratuitous payment. So how, you know, and especially if you look at the receipts. Well, that's one theory we're being told, okay? But if it was a gratuitous payment, what effect does that have on your claim? Or do we need more findings by the district court and a closer look at whether that story holds together? Judge, if it was a gratuitous payment as such, then it wouldn't come under the protections of the Illinois Wage Deduction Act. It would not be exempt, and it would be fully subject to Dave Vankus's lien. Okay. You know, it's just like any other payment that, it would be any other payment that the employer, you know, would make to an employee. That's not wages. Does the record tell us how RBG accounted for these payments to Mr. Lindstrom for tax purposes, for, in essence, talking to their shareholders? Nothing, Your Honor. They resisted discovery in all manner and form, and, you know, at a point we just simply got fed up and moved for relief under the statute. Okay. Can I ask you also, in your brief you talk about the December 23 document as a contract.  And they say it's a spreadsheet. We've got this metadata information. I understood your argument to be a little less talismanic about that piece of paper and more to the effect that this reflects what you understand to be an oral agreement between Lindstrom and Russian to arrange, to calculate this based on the information concerning the loans, the debts owed by Lindstrom to RBG, and the stock options. Right. Is that right? Right. I mean, your client signed it, right? Or, no, Lindstrom signed it.  Yes. Lindstrom signed it. But your theory is not that that document captures the whole contract or is the contract, is it? No, Your Honor. To us, there is some extraneous facts that you need to read in to understand that correctly. But you have to understand that when that agreement was executed in December of 2023, the trajectory of the facts and the law were that Venkis had a first lien on those stock options. They were worth $445,000 despite its claim to have a secured interest in that property, that they were pledged to repay loans that they had made to Lindstrom. There was no pledge whatsoever. So the trajectory of facts is that those funds were subject to David Venkis' lien in full. And you could ask RBG, what was the purpose of that agreement? We will. There is no purpose of that agreement except to avoid our lien. So I'm going to reserve the rest of my time, Your Honor, for rebuttal, if it's okay. That's fine. All right. Thank you. Thank you. Mr. Wyslowski? Mr. Wyslowski? Good morning. Good morning. May it please the Court. This Court should affirm the District Court because the Court correctly determined that the amount paid by RBG in December 2023 was a severance falling under the definition of wages under the Wage Deduction Act and therefore subject to a 15% cap on collection to a judgment creditor. And secondly, because the Court did not clearly err in finding that the amount of that severance was $73,090. Is it your position that this is a severance payment? It is. So the parties called it a severance. John Rushin, the Chief Operating Officer of Ryan Building Group, calls it a severance. It's been called a severance throughout this case. Was there any contractual agreement that you owed him a severance? No. There was no contractual agreement that RBG owed Lindstrom a severance. When it was paid out to him on his pay stub, it was called a stock bonus. This amount of money really is more akin to a bonus than a severance. I have a hard time seeing, given that Mr. Lindstrom stole from your company more than once and defrauded them and was fired for that reason, that you're paying him anything. That raises a red flag for me. I can understand that, Your Honor. And in practicing law, I had a similar cynical approach in my own mind. I don't think it's cynical. I think it's based on the facts that your client was the victim of his actions at least twice, and yet out of your goodwill, you're willing to pay him a stock bonus or a severance or whatever you want to call it just raises a fact for me that questions the transaction here. I can understand that, Your Honor. And the district court was the court that was in the best position to evaluate that fact. Don't we have exactly the same evidence in front of us? You do have exactly the same evidence in front of you, Your Honor. The district court seemed to take your word for it that this was a severance and that the options had expired. I don't think that's true. I think that there's substantial evidence in this record to demonstrate that the options did in fact expire, and the only evidence about why RBG paid the severance is the testimony of Mr. Russian, which is in the record. Why wouldn't the December 23rd agreement, slip of paper, whatever you want, that shows those options having the exact $400,000 plus as a starting point to offset your client's debt, the debt that Mr. Lindstrom owed to your client, why wouldn't that raise an issue of fact about whether or not these had really expired? Because, for a number of reasons, the options are governed by two formal definitive documents, the option agreement and the stock incentive plan. Those are fully integrated, signed by all parties. The December 2023 agreement, as it's called, which the district court found was in fact no agreement at all, is simply a calculation that was used to arrive at the... But you used the exact value of the options as if they had been exercised. If they expired, there's no value at all, correct? Correct. But your client used the exact value of those options as if they had been exercised, and it wasn't just a calculation. It was used to offset a debt owed to you. I have a hard time seeing how that doesn't raise an issue of fact because that seems directly contrary to the written agreement. It is contrary to the written agreement, meaning the plan and the option agreement. The district court weighed the evidence and found that the options had expired. That's a finding of fact that is entitled to clear error deference. I also would direct the court... But there really wasn't much evidence in there. The district court seemed to take this as if it were a summary judgment and view things in the light most favorable to your client. I think that is ascribing a motivation to the district court and Judge Jenkins. No, it's not a motivation. Looking at the record and looking at the opinion, there was no hearing held. There was no assessment of credibility. There was this agreement, this document dated December 23rd, that shows those options had a value that your client used as a basis to offset liability owed to your client. That seems contrary to what the written agreement. You've admitted that's contrary to the written agreement. Without some type of hearing or credibility determinations, I don't know how an assessment could be made at this stage. Understood, Your Honor. I would direct the court to what Mr. Lindstrom says about the 2023 payment. He was asked at his deposition, and this is at Appendix 184. It's a deposition transcript, and it's pages 83 and 84 of that deposition transcript. And Mr. VanGus' attorney asked Mr. Lindstrom, would you have had any claim against RBG for any amount in excess of what they paid, referring to the $73,000 number? And Lindstrom's answer was no. He was not entitled. I understand. I guess where I need to move away from Lindstrom's explanation. I'm really listening for RBG's explanation for giving these worthless expired strike options value of almost a half a million dollars if they had no value according to Lindstrom. So to be clear, Ryan Building Group, I understand the December 2023 spreadsheet starts with a $445,000 number, and it assigns that value to those options. As well as to debt that Lindstrom owed to RBG. Yes, that is absolutely correct. And the answer to why RBG paid this $73,000 figure to Mr. Lindstrom is set forth in Mr. Rushen's affidavit. And it is a good nature, out of the goodness of RBG's heart, wanted to make sure that this person, who is likely unemployable going forward, he's got two big strikes, would have something to be able to move on to the next chapter of his life. I think we should be encouraging employers to do that, not discouraging employers to do that. Right, when it's not at somebody else's expense. And when your client, the employer, doesn't get a benefit from it. Correct. There was no benefit to RBG. No, that's not true. Are you still carrying the debts to Lindstrom? Absolutely. As assets of the company? Correct. Had those debts been extinguished, 1099s would have been issued for the extinguishment of that debt. They were not. And that's detailed in Mr. Rushen's affidavit as well. What I'm wondering about, Mr. Kozlowski, is whether, in essence, a new round of discovery is in order where Mr. Vankis gets to put this transaction under a microscope. I don't think that it is, Your Honor, because we've done multiple rounds of discovery. We answered many interrogatories, many requests for production. I understand that Mr. Vankis had his bite at the apple. He should not get another one. And in this case. But was he given a fair bite? When we look at the timing of when Mr. Vankis was told the value of the stock options, when he, for months, asked for the valuation, when he reserved the right to those stock options, he's told this information after the transfer. I think that the timing is important, and it demonstrates that the judgment creditor here had more than enough time to go after these options. The options were at play for several years. Mr. Vankis had the option agreement starting in 2018. He was provided it again via email in 2022. It wasn't until 2023, late in 2023, that Mr. Lindstrom was terminated, triggering that 30 days. Mr. Vankis had a judgment. He had a lien on all property owed or assets and income to the debtor. At any point in time during that 2022 time frame and 2023, like, for example, when Mr. Vankis moved for the wage deduction order, he could have said, I want those options too, and I want to step into the shoes of Mr. Lindstrom, and I want to know all about them, I want to exercise them, and I want that value. Mr. Vankis chose not to do that, and he chose not to do that for more than a year. Hunter, if I understand, your client says, okay, we're treating these as exempt wages, right, with a 15% cap on garnishment, but that 15% was paid to Mr. Vankis. In the terms of 12-801, how is any of this amount, quote, owed by an employer to a judgment debtor? So I think that that word owed in this particular statute, if we look at the statute as a whole, a wage deduction order, as it fits into the Illinois collection procedures, what we're really looking for is unpaid wages. These are expectancies that are due to a judgment debtor that can be attached. And so I don't believe that the word owed has a particular legal meaning that the judgment debtor has a contractual right, for example, to these wages or an equitable right to these wages. It's simply are these wages going to be paid to the judgment debtor. How do you get that? Well, because of the broad nature of the definition as well as the overall. So you think that would apply to just voluntary gifts to an employee? If, well, it depends on the nature of the gift. I think the cases make one thing clear. It's that the nature and character of the underlying asset or income ought to control. If that were a gift. That's a standard that poses problems for you guys then. Well, if it were a gift that were related to compensation or for services performed, then, yes, it would be wages. If it were a Christmas present or a thing of value that a boss got to an employee simply because of a personal or social relationship, I think it probably falls outside the scope of wages. And if we look at the plan, the stock option plan, excuse me, the stock incentive plan, which is Appendix 119, talks about that these stock options are designed to compensate. I'm reading from Section 1 here. To provide competitive compensation opportunities. Originally, yes. But your whole premise here, if I understand it correctly, is that this was something that Russian did out of the goodness of his heart. That RBG did, yes. Sorry, RBG.  That it was not owed to Mr. Lindstrom, but that RBG chose to make this gratuitous payment to him. In an amount that happened to be the net of the value of the stock options minus the amounts he owed RBG. Yes, that is correct. And I don't think that that is suspicious. If you're in RBG's position, if you're in Mr. Russian's position, and you do want to, in your own mind, do right by this employee who has made some bad decisions. Who was stolen from you. Who was stolen from you. Right. It's more than made bad decisions. On numerous occasions. Yes, yes. How would you arrive at a fair amount? How would you calculate that amount? Why is he entitled to anything? I won't prosecute. He's not. To be clear, Mr. Lindstrom was not entitled to exercise the stock options after they expired. And certainly no one exercised the stock options. There was no strike price paid. You're saying he was not entitled to exercise the stock options? Once they had expired. Once, okay. So if he had exercised the stock options before the 30-day period, do you agree that the judgment creditor would have been entitled to at least 15% off the top of the $455,000?   Because. And maybe all of it, depending on whether or not it qualifies as wages. But you agree that their lien took priority over any amounts owed to you or anybody else? There is a waterfall. So. That doesn't answer that question. I mean, that's a yes or no. I think you agreed to it initially that if they're entitled to at a minimum 15%, if it falls under the wages, if they're entitled to 15% of the $445,000 before anybody else gets anything. I think you said yes to that. I did. Because they have priority. Only to, and I may have misspoken. Please allow me to clarify. The judgment creditor has priority. However, the judgment creditor can only receive what Lindstrom can receive. That's why I said if he exercised the options within the 30 days and was entitled to the $445,000, you agree that they had priority over anybody else? They, the judgment creditor. Correct. If Lindstrom were entitled to $445,000, I think based on the stock options, I think that it's also fairly clear that those would be wages under the statute subject to the 15% cap. Okay. I see that my time has expired. Okay. Thank you very much. Thank you. Mr. Stewart? Thank you, Your Honor. There's simply no question that David Bankus's lien had first priority lien on the stock options that were owed to Mr. Lindstrom. There. Was there any reason why Lindstrom did not exercise these options in a timely way? Well, Your Honor, Lindstrom and RBG were sort of in equipoise because RBG made it clear to Lindstrom that if he ever exercised these options, you know, that they would, at the very least, they would take back the money that was owed to them. The problem with that theory was that David Bankus showed up with his lien and judgment. And so that equipoise that they were, the two of them were in, that is RBG and Lindstrom, they didn't, RBG didn't do anything about this debt for years, you know? They didn't seek to collect it as, you know, as a wage deduction for Lindstrom's wages or anything else like that. They were simply waiting for these stock options to pay off at some point and deal with it later on. That's the collusive relationship between these two. Judge, what do we do with the contention that Mr. Bankus was also aware of the stock options and did nothing? Yeah, Judge, that's a red herring. You know, Bankus never had an opportunity to exercise those options. Everything was done behind his back. In the discovery that, you know, that has been touted by RBG, they never, ever once produced the December 23 agreement. Never once, and never any documentation around it, never any drafts of that agreement, no correspondence concerning that agreement, nothing. They said it was irrelevant. And it was at that point, we're in supplementary proceedings now. And supplementary proceedings are supposed to be, as this court has observed, swift, cheap, and informal. And when we found that RBG was simply giving us, you know, talk to the hand type of attitude, then we moved for relief at that point. And this court has also pointed out in supplementary proceedings, this isn't just like an ordinary summary judgment motion. It has a lot of the aspects of a summary judgment proceeding. But it's not. They're summary proceedings. And there's a default rule. And when the respondent can't come up with any decent reason why an asset should be turned over, or just plays for time and comes up with nonsense, then the district court is correct in ordering assets turned over. In this case, everything that RBG said was absurd. You know, the fact that there was no debt satisfaction. Well, you know, you could look at the document itself, and you could see that it's offsetting debts. That it wasn't an agreement. The document that they composed has a line for Lednstrom Signature that says, agreed as above. Even they named the document, the lease agreement, and they never had to say why they named the agreement a lease agreement. Mr. Stewart, what's the market like for this stock in RBG? There's no market. It's all, in my experience, an appraisal company will come in. It's closely held? Yes. Okay. My time is up. But I would ask the court to reverse the district court both on its assessment of the construction of the Illinois Wage Deduction Act, and also on its valuation of the assets at issue here. They should have been valued at $445,000. Thank you. Thank you. Thanks to both counsels. The court will take the case under advisement. Your Honor, if I may, just 10 seconds to respond to the discussion. Your time is up. Thank you.